FILED

2009 Mar-23  PM 03:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALEXANDRIA R. ANDREWS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:07-CV-01003-RDP** |
| | } | |
| **WASTE AWAY GROUP, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant Waste Away Group, Inc.'s ("Waste Away")

Motion for Summary Judgment (Doc. #22), filed August 7, 2008.  The motion has been fully briefed[1]

and was under submission as of November 10, 2008 (Doc. #39).

Plaintiff Alexandria Andrews commenced this action on May 30, 2007 by filing a complaint

in this court alleging that Waste Away discriminated against her on the basis of her sex with regards

to pay and other terms and conditions of employment in violation of Title VII of the Civil Rights Act

of 1964.  42 U.S.C. § 2000e *et seq*. (Doc. #1).  Plaintiff amended her complaint on October 22, 2008

adding a claim for violation of the Equal Pay Act of 1963.  29 U.S.C. § 206(d).[2]  Specifically,

---

[1] Defendant filed a brief in support of its motion (Doc. # 23), and evidentiary submission
(Doc. # 24) on August 7, 2008.  Plaintiff submitted a brief in opposition to Defendant's motion along
with evidentiary submission (Docs. # 28, 29, 30) on September 15, 2008. Defendant subsequently
filed a reply brief with supplemental evidence (Doc. # 33) on October 7, 2008.  Plaintiff filed a sur-
reply with supplemental evidence (Doc. #36) on October 28, 2008.  Defendant filed a response to
Plaintiff's sur-reply (Doc. #38) on November 4, 2008.

[2] Plaintiff's opposition to summary judgment concedes her Equal Pay Act claim.  (Doc. #30
at 18, n. 4).  As such, she has abandoned that claim and it will not be considered in this opinion.

Plaintiff asserts that Defendant discriminated against her by: (1) changing her work/duty assignments; and (2) denying her the opportunity to earn as many overtime, special time, and Saturday hours as male employees.  For the reasons outlined below, the court finds that Defendant's motion is due to be granted as there are no disputed issues of material fact and Defendant has demonstrated that it is entitled to judgment as a matter of law.

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

2

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## II.    Relevant Undisputed Facts[3]

Defendant Waste Away is in the business of solid waste collection, hauling, and disposal. (Doc. #24-4 at ¶ 3). Waste Away hired Plaintiff on December 2, 2004 to work as a driver for its residential operations. (*Id.*; Doc. #24-1 at 78; Doc. #28-2 at ¶ 3). There are several types of residential drivers: (1) automatic side loader ("ASL") drivers (also called "1 Person" drivers because they can perform the job alone through the use of a mechanical arm); (2) rear-loader drivers, also called "2 Person" or "3 Person" drivers depending on the number of helpers assigned to assist the driver; (3) swing drivers; and (4) satellite drivers; however, Defendant maintains a general job description for "Driver," and does not maintain specific job descriptions for each of the above positions. (Doc. #24-4 at ¶ 5; #24-5; #24-1 at 80). The most common types of residential drivers

---

[3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

are ASL drivers and rear-loader drivers – which is subdivided into rear-loader recycle drivers and rear-loader solid waste drivers.  (Doc. #24-4 at ¶ 6).

Rear-loader drivers generally work with at least one helper who manually deposits the trash into the back of the truck.  (Doc. #24-1 at 81-83)  When operating with a helper, a rear-loader driver does not get out of the truck to pick up garbage. (*Id*.).  Generally, ASL drivers do not have helpers because a mechanical arm picks up the waste material.  However, sometimes ASL drivers do have a helper when there are small personal garbage cans on a given route that don't fit the mechanisms of the ASL truck.  (*Id*. at 81-82, 101).  An ASL driver must be certified to operate the ASL truck and have the necessary skills and training to do so.  (Doc. #24-4 at ¶ 9).

Residential Drivers are paid in accordance with a day rate determined by the contract under which the particular drivers are working.  (*Id*. at ¶ 10; #24-1 at 86).  All drivers are permitted to earn overtime as needed during the workweek to complete their assigned routes.  (Doc. #34 at Ex. A ¶ 4).  Management does not dictate or assign the number of overtime hours a driver works during the workweek.  (*Id*.).  Overtime is paid to residential drivers by converting the driver's day rate into an hourly rate.  (Doc. #24-4 at ¶ 10).  Drivers earn one-and-a-half times their hourly rate for the week for every hour they work over forty hours in a given week.  (Doc. #24-5 at Ex. B; #24-1 at 216-217).[4] All drivers are permitted (and expected) to work whatever overtime is necessary to complete their assigned routes.  (Doc. #24-1 at 216, #24-5, #34 at Ex. A  ¶ 4).

"Special time" is given based on the employee's position and years of service and requires the approval of the residential route manager.  (Doc. #24-5).  The starting day rates for the different

---

[4] Hours per week include the total time spent completing a driver's normal route, special time hours, and down time hours.  Overtime hours are given for all hours over forty earned for any reason during the workweek.  (Doc. #24-5).

driver classifications are described in the Waste Management of Birmingham Hauling Residential Incentive Pay Plan ("Pay Plan"). (*Id*.). The Pay Plan was implemented to compensate residential drivers and helpers with a day rate that is equitable to the type of work that is completed in the varying residential collection systems. (Doc. #24-4 at ¶ 11). An employee's day rate is subject to annual seniority-based increases. (*Id*. at ¶ 12). Under the Pay Plan, ASL drivers are paid at a higher rate because they have the skills and ability to drive the ASL truck and can therefore perform waste collection without the expense of a helper. (*Id*. at ¶ 13; Doc. #24-1 at 133). Driving an ASL truck requires different skills than driving a rear-loader truck. (Doc. #24-1 at 186–87).

Prior to her employment at Waste Away, Plaintiff worked as a driver for Onyx, a competitor of Waste Away. (Doc. #28-2 at ¶ 3). As a driver with Onyx, Plaintiff drove an ASL, a knuckle boomer (a truck that picks up rubbish such as leaves and brush), and a rear-loader. (*Id*.). Plaintiff possesses a class "A" commercial drivers license. (*Id*.).

When Waste Away hired Plaintiff, it began training her to assume the position of an ASL Driver (1-Person Solid Waste Driver). (Doc. #24-4 at ¶ 14). Before Plaintiff completed her training or had assumed the ASL position, another more senior employee, Timothy Holmes, expressed a desire for the vacant ASL position and threatened legal action if he was not properly considered for the position. (*Id*. at ¶ 16; Doc. #24-1 at 90-92). Waste Away decided in December 2004 to place Holmes in the ASL position and to start Plaintiff as a rear-loader driver (following her training period). (Doc. #24-4 at ¶ 16). At the time, Holmes not only had more seniority than Plaintiff, he was already certified to drive the ASL truck. (*Id*.). Though Plaintiff was still training to drive the ASL truck, she had experience operating ASL trucks as a garbage driver for Onyx. (Doc. #28-2 at ¶ 3).

5

Plaintiff assumed Holmes's prior route as a rear-loader recycle driver.  (Doc. #24-1 at 94, 156).  Plaintiff drove only a rear-loader truck throughout her employment with Defendant.  (Doc. #24-4 at ¶ 18).  When Holmes had previously performed the recycle route, he had been given a helper only three days a week  (due to low volume of recycle waste on that route).  (*Id*. at ¶ 19; Doc. #24-1 at 156).  For the first six weeks, when taking over Holmes's route, Plaintiff was allowed to have a helper every day to allow her to acclimate to the route.  (Doc. #24-4 at ¶ 20; #24-1 at 156-62).  After the first six weeks, once she became acclimated to the route, she was to be given a helper only three days a week.  However, when Plaintiff subsequently suffered an on-the-job back injury, she was given a helper every day.  (Doc. #24-4 at ¶ 20; #24-1 at 157-62, 171).

In August 2005, management informed Plaintiff that since her work restrictions had been lifted, she needed to reduce the number of helpers she was using to three days a week, as the position was originally structured.  (Doc. #24-4 at ¶ 21; Doc. #24-1 at 157-62; 171).  Plaintiff was offered the choice of continuing her recycle route with a helper three days a week or accepting a solid waste/garbage route that would allow her to have at least one helper every day. (Doc. #24-1 at 171-72).  Defendant offered Plaintiff the solid waste/garbage route, which paid a higher day rate, "in order to be accommodating."  (*Id*. at 173-75; 212).  Plaintiff decided to accept the solid waste/garbage route and continued to  service this type of route throughout the remainder of her employment.  (Doc. #24-4 at ¶ 23, 31).  Plaintiff's pay was not reduced and she received a raise when she assumed the solid waste/garbage route.  (*Id*. at ¶ 24; Doc. #24-1 at 128-29).  In August 2005, Plaintiff's day rate increased to $125.00.  (Doc. #24-4 at ¶ 25; #24-1 at 128).

After accepting the garbage route, Plaintiff took a scheduled leave of absence to have elective surgery.  (Doc. #24-1 at 175-76).  Her pay was not reduced, and after having surgery she took an

unscheduled two month leave of absence due to complications arising from the medical procedure. (*Id*.; Doc. #24-4 at ¶ 24).   During that time, Waste Away acquired a new contract and needed to reconfigure many of its routes, though it did not reconfigure Plaintiff's route.   (Doc. #24-4 at ¶ 27; #24-1 at 176-77).   While a substitute driver, Fred Logan, was manning Plaintiff's route, it was changed from a rear-loader route to an ASL route.   (Doc. #24-4 at ¶ 28; #24-1 at 178-79).   When she returned, Plaintiff was offered the ASL route, but she rejected the prospect of driving an ASL.   (Doc. #24-1 at 179-83).   Plaintiff refused to be trained on the ASL trucks because she was uncomfortable operating them due to, as she describes it, a high incidence of malfunctioning associated with them. (*Id*. at 183-86).

After turning down the ASL route, Plaintiff was assigned another rear-loader garbage route. (*Id*. at 190-92).   In April 2006, Plaintiff received her annual increase in her day rate to $127.81. (Doc. #24-4 at ¶ 34; #24-1 at 128, #24-2 at Ex. 3).   In April 2007, Plaintiff received another increase and her day rate to $130.37.   (Doc. #24-4 at ¶ 35; #24-1 at 128, #24-2 at Ex. 3).   Plaintiff worked the same garbage route from November 2005 throughout the remainder of her employment with Waste Away.   (Doc. #24-4 at ¶ 31).

Special time assignments are volunteer assignments performed by residential drivers after completion of their normal responsibilities.   (*Id*. at ¶ 36).   Drivers who perform special time work are paid at a premium rate, or "special time" pay rate, which is based on the employee's position and years of service.   (*Id*. at ¶ 37).   Special time assignments are assigned to drivers by the Residential Route Manager responsible for the work that needs to be completed. (*Id*. at ¶ 38).   The Route Manager attempts to assign special time work to the driver who can perform it most efficiently and economically, taking into consideration a driver's proximity to the work, availability, familiarity with

the route (although, according to Plaintiff, all drivers are familiar with each other's routes) and

qualifications to operate the needed equipment.  (*Id*. at ¶ 39; Doc. #24-14 at ¶ 6).  In the 180 days

before Plaintiff filed a charge with the EEOC (in August 2006), Plaintiff earned 48.5 special time

hours. (Doc. #28-5).  Cleophus Gamble was the only employee, male or otherwise, who earned more

special time hours during this period. (Doc. #28).  Jimmy Perdue received 39.86 hours during the

same period.  (Doc. #28-3).[5]   During the entire actionable period (beginning in February 2006),

Plaintiff earned more special time hours than any other employee except for Gamble. (Doc. #28,

#29).  In April 2007, Waste Away management entered into an agreement with Plaintiff that she

---

[5]Plaintiff argues that she earned fewer special time hours than both Gamble and Perdue during the period from February 2006 through December 2006.  Indeed, Plaintiff is correct in that assertion.  During that time period Plaintiff earned at least 67.5 special time hours (Plaintiff's Exhibit 5 is missing payroll calculation worksheets for April 29, 2006 and May 6, 2006. (Doc. #28-5)), Jimmy Perdue earned at least 128.76 special hours (Plaintiff's brief indicates that Jimmy Perdue earned 144.76 hours during this period.  However, the record does not contain Perdue's payroll calculation worksheet for the weeks ending in May 13, 2006 and July 29, 2006.  According to all of the pages contained in the record, Perdue earned 128.76 special hours.  (Doc. #28-3)), and Cleophus Gamble earned at least 735.09 special time hours (Plaintiff's Exhibit 4 is missing payroll calculation worksheets for the weeks ending in May 13, 2006; July 15, 2006; August 5, 2006; and September 16, 2006.  (Doc. #28-4)).  (Doc. #28-3, #28-4, #28-5).

However, the court does not understand why the time period asserted by Plaintiff is relevant. Plaintiff complained that she was not awarded special time opportunities comparable to male employees during the 180 days before she filed her EEOC charge.  The undisputed facts, however show that only Gamble received more special time during this period, not Perdue.  The court does not take at face value Plaintiff's conclusory "fact" that she only began to receive special pay hours comparable to male co-workers after she filed a charge of discrimination.  (Doc. #28-2 at ¶ 18).  If anything, the facts show the opposite, that she was receiving more special pay than every male employee except Gamble before she filed her charge, and actually received fewer than an additional male employee, Perdue, immediately afterwards.  Defendant contends that Perdue received more special time pay during this period while operating an industrial roll-off vehicle used for leaf collection.  (Doc. #34 at Ex. A ¶  2-3; #24-14 at ¶ 8).  Plaintiff has never claimed that she was qualified to operate an industrial roll-off leaf collection vehicle, nor has she provided any evidence that she attempted to make Waste Away aware that she was capable of operating that type of vehicle. In any case, during any relevant time period for purposes of determining Plaintiff's claims of discrimination, Gamble was the only employee who earned more special time hours than Plaintiff.

would receive a guaranteed minimum of six hours of special time every week in exchange for her servicing an additional area on Friday afternoons.  (Doc. #24-1 at 101-02, 127).

Cleophus Gamble began working for Waste Away in March 1996, eight years before Plaintiff arrived.  (Doc. #24-4 at ¶ 41; Doc #24-1 at 129-32).  Gamble works a route in Mountain Brook as a rear-loader driver.  (Doc. #24-1 at 135-37).  Gamble reports to, and is assigned special time projects by Tony Richardson (the Route Manager over his territory).  (Doc. #24-4 at ¶ 41).  Plaintiff works under a different manager (Jake Herndon) in a different area (Shelby County) which is not in close proximity to Gamble's route.  (*Id.* at ¶ 43).  Though his route is in Mountain Brook, Gamble has also been called upon to serve Shelby County, Pleasant Grove, and Trussville.  (Doc. #28-2 at ¶ 17).

Plaintiff does not generally complete her assigned route until after 4:00 p.m. Monday and Tuesday.  (Doc. #24-1 at 97-98).  She generally completes her Wednesday, Thursday, and Friday routes between 2:00 p.m. and 3:00 p.m.  (*Id.* at 99-100).  Saturday work, when available, is assigned by supervisors to employees who express interest in working the extra day and who are the best qualified to economically perform the necessary work. (Doc. #24-4 at ¶ 45; #24-14 at ¶ 16).  Each week employees wanting to work on Saturday are required to make a request for the extra work.  (Doc. #24-4 at ¶ 46; #24-14 at ¶ 17).  Based on the flow of work for the week, by Friday afternoon, the Route Manager decides whether Saturday work is available.  (Doc. #24-4 at ¶ 47; #24-14 at ¶ 18).  The Route Manager reviews the drivers who have expressed an interest in Saturday work for that week, and determines which drivers are most familiar with the route and best suited to perform the work the most economically.   (Doc. #24-4 at ¶ 49; #24-14 at ¶ 20).

In 2007, Plaintiff started a lawn service and she operates that business on the weekends. (Doc. #24-1 at 68–70). Plaintiff testified that she started that business because she was not getting enough special time opportunities at Waste Away. (*Id*. at 117-18).

Plaintiff recalls specifically requesting Saturday work from supervisors Tony Richardson, Steve Anderson, and Jake Herndon "at least four or five" times. (*Id*. at 113-18; Doc. #24-14 at ¶ 24). During the actionable period, Plaintiff received Saturday work at least seven times. (Doc. #24-4 at ¶ 51; #24-2 at Ex. 3). Plaintiff has been compensated for all overtime work. (Doc. #24-4 at ¶ 51; #24-2 at Ex. 3). An ASL driver can generally perform Saturday work more economically than a rear-loader driver because she can perform the work alone without the need for (or expense of) a helper. (Doc. #24-4 at ¶ 52; #24-14 at ¶ 22). Herndon told Plaintiff that it is more economical to use ASL drivers for Saturday work, as opposed to having her and a helper perform the work. (Doc. #24-1 at 114). All of the drivers in Plaintiff's territory are ASL drivers except for her and John Johnson. (Doc. #24-4 at ¶ 53).

John Johnson is trained, certified and experienced in driving both rear-loader trucks and ASL trucks. (*Id*. at ¶ 55). Johnson is a fourteen year employee with significant seniority and is familiar with many routes. (*Id*.) Angelo Wilson, James Whetstone, Jason Whetstone, Tim Holmes, Ronald Underwood, and Jason Hennington are all certified ASL drivers. (*Id*. at ¶ 54). John Johnson volunteers virtually every week for any available Saturday work. (Doc. #24-14 at ¶ 23). According to Plaintiff, she stopped volunteering for Saturday work when it became clear, in her mind, that she was not going to be considered ahead of her male co-workers. (Doc. #30 at ¶ 67 (*citing* Doc. #24-1 at 113-18)).[6]

---

[6] The portions of her deposition to which Plaintiff cites do not contain this proposition.

III.   **Discussion**

Plaintiff's claims can be divided into three categories: (1) claims arising from changes in her work duties/assignments; (2) claims of discrimination by supervisors in assignment of special time/Saturday work; and (3) claims for denial of overtime opportunities.  Each category will be discussed in turn.

A.   **Legal Background**

In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318,1330 (11th Cir. 1998)*; see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).   A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1517 (11th Cir. 1990) (*citing Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n. 13 (11th Cir. 1988); *see Wright v. Southland Corp.*, 187 F.3d 1287, 1293-94 (11th Cir. 1999) (defining direct evidence as  "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

Here, Plaintiff has attempted to present circumstantial evidence of gender discrimination. "In evaluating Title VII claims supported by circumstantial evidence, [the courts of this circuit] use

the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." *Combs*, 106 F.3d at 1527 (parallel citations omitted). Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See id.* at 1527-28. The methods of presenting a *prima facie* case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983). A plaintiff may establish a *prima facie* case of disparate treatment gender discrimination by showing that (1) she belongs to a protected group; (2) she was qualified to do the job; (3) she was subject to an adverse job action; and (4) her employer treated similarly situated employees outside the protected class more favorably.[7] *Webb-Edwards v. Orange Co. Sheriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008) (*quoting Hinson v. Clinch Co. Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000)).

Once the plaintiff has shown a *prima facie* case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254-55; *see Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). If the employer satisfies that burden by articulating one or more such reasons, then the presumption of

---

[7] *See also McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the *prima facie* proof required from respondent is not applicable in every respect in different factual situations.").

discrimination is dispersed and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.  When the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. *Chapman*, 229 F.3d at 1024-25.  Although the *prima facie* case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the *prima facie* case.  *Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may defeat a summary judgment by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 148-49 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); *see also Hicks,* 509 U.S. at 524; *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38

(interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

### B.    Plaintiff's Changes in Her Work Duties and Assignments Claims

In her Complaint, Plaintiff appears to claim that various changes in her job assignment prior to August 2005 were somehow discriminatory in nature.  Specifically, she challenges the type of truck she was originally assigned soon after she began her employment with Waste Away (December 2004), and her transfer in August 2005 from a recycle route to a solid waste/garbage route.  Because Plaintiff failed to timely file a charge of discrimination with the EEOC, these claims are due to be dismissed.

Title VII specifies the prerequisites that a plaintiff must satisfy before filing a private civil action under Title VII.  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002). Accordingly, to this provision, "[a] charge . . . shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred[.]"  42 U.S.C. § 2000e-5(e)(1); *Pijnenburg v. West Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) ("It is settled law that in order to obtain judicial consideration of a [Title VII] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred.").  "Thus, if a plaintiff fails to file an EEOC charge before the 180-day limitations period, the plaintiff's subsequent lawsuit is barred and must be dismissed for failure to exhaust administrative remedies." *Crayton v. Alabama Dept. of Agriculture & Industries*, 589 F.Supp.2d 1266, 1278 (M.D. Ala. 2008) (*citing Brewer v. Alabama*, 111 F.Supp.2d 1197, 1204 (M.D. Ala. 2000)); *see also Delaware State College v. Ricks*, 449 U.S. 250, 256, (1980); *Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1410 (11th Cir.1998).

14

With respect to her vehicle assignment, Plaintiff contends that she was originally hired with the understanding that she would be driving an ASL truck, but after two weeks of preliminary training she was assigned to drive a rear-loader truck. (Doc. #24-1 at 88–91). There is no dispute that this change took place within a few weeks of her hire date in December 2004. (*Id*. at 138-41; #12 at ¶5-6). This was the only change Defendant made with respect to Plaintiff's vehicle assignment (in December 2004 or at the latest, January 2005) and Plaintiff continued to drive a rear-loader truck throughout the remainder of her employment. (Doc. #24-4 at ¶18). As such, this challenged decision took place more than a year and a half before Plaintiff filed her first EEOC charge on August 1, 2006.

Similarly, Plaintiff's claim based on being moved from a recycle route to a solid waste/garbage route is untimely. It is undisputed that this decision was communicated to Plaintiff in August 2005 and that Plaintiff serviced a solid waste/garbage route from August 2005 throughout the remainder of her employment. (Doc. #24-1 at 164, 191, 213; #12 at ¶8).[8]

Plaintiff alleges that these changes in her job assignments/duties were made because of her sex. However, Plaintiff did not file a Charge of Discrimination with the EEOC until August 1, 2006 – almost 20 months after she was assigned to rear-loader truck and almost a year after she was reassigned to a garbage route. (Doc. #24-1 at Ex. 6). Moreover, according to Plaintiff, she believed at the time she transferred from the recycle to garbage route, that this decision was discriminatory. (*Id*. at 237). Any sex discrimination claims asserted by Plaintiff based on these changes in job

---

[8] To the extent Plaintiff is challenging management's decision not to allow her to continue to utilize a helper everyday on the recycle route, this decision was made and communicated to Plaintiff before she transitioned to the garbage route in August 2005. (Doc. #24-1 at 164-65, 171).

15

assignment (or any other changes implemented prior to February 2, 2006) are untimely.  Defendant's summary judgment motion is due to be granted with respect to these claims.

Furthermore, Plaintiff does not make any arguments regarding changes in her vehicle and job assignments in the summary judgment record.  Her abandonment of these claims against Waste Away is an additional, independent reason for granting summary judgment.  "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Edmondson v. Board of Trustees of University of Alabama*, 258 Fed.Appx. 250, 253 (11th Cir. 2007) (*citing Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her.  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments. . . . Here, [plaintiff] did not respond to [defendant's] motion for summary judgment on the Equal Protection Act claim. Therefore, she has abandoned it."); *see also Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995) ("Summary Judgment is appropriate since plaintiff failed to respond to [defendant's] argument on this issue.") (citations omitted).  For all of these reasons, Plaintiff's changes in job assignments/duties claims cannot survive Defendant's motion for summary judgment.

### C.    Plaintiff's Special Time and Saturday Work Claims

Plaintiff's only potentially viable Title VII claim relates to the assignment of "special time" hours and "Saturday work."[9]  Defendant argues that Plaintiff fails to establish a *prima facie* case of

---

[9] Both Plaintiff and Defendant's briefs refer to "special time" and "Saturday work" as two separate types of assigned extra work.  However, there appears to be no evidence in the record that distinguishes between the two.  What is clear, from the record, is that special time and Saturday work

discrimination based on the alleged denial of special time opportunities.  Additionally, assuming Plaintiff can establish a *prima facie* case, Defendant asserts that Plaintiff has failed to provide sufficient evidence that Defendant's legitimate nondiscriminatory reasons are merely pretext for gender discrimination.  The court agrees.

### I.        Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination

"In a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similarly situated to [her]."  *MacPherson v. University of Montevallo*, 922 F.2d 766, 774 n. 16 (11th Cir. 1991).  The plaintiff must show that she shared the same type of task as the comparators.  *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004) (overruled on other grounds) (*citing Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992)).  "A comparator is an employee similarly situated to the plaintiff *in all relevant respects*."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008). (internal quotations and alteration omitted, emphasis added).  It is not always possible to find a suitable comparator, and the Eleventh Circuit has noted that "if a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *Id*. at 1277 (quotation, alterations, and emphasis omitted).

---

are both forms of extra work assigned to employees by supervisors.  The Waste Management Residential Incentive Pay Plan (Doc. #24-5) only lists "special time pay," and is silent on the subject of "Saturday work."  Likewise, the Payroll Calculation Worksheets (*See, e.g.,* Doc. #24-2 at Ex. 3) have a space for "Special pay," but no mention of "Saturday work."  Because the evidence of record indicates that special time and Saturday work are assigned in the same way (an employee must request extra work, be assigned this extra work from a supervisor, and has the opportunity to be paid a premium salary for extra work assigned), and Plaintiff's claims of denial of both of these benefits are identical, the court will address these issues together, generally only referring to "special time pay" as indicated in the Waste Management Residential Incentive Pay Plan.

Plaintiff identifies two potential comparators, Jimmy Perdue and Cleophus Gamble. As explained above, Perdue is not a proper comparator because the evidence of record clearly shows that he was not treated more favorably than Plaintiff during any relevant period. *See* II., *supra*. Plaintiff earned more special time hours than Perdue during the 180 days before she filed a charge of discrimination with the EEOC. Plaintiff also received more special time hours for the entire relevant period discovered in this law suit. Perdue only earned more special time hours than Plaintiff in the four months *after* Plaintiff filed her EEOC charge.[10] This does not support Plaintiff's contention that she began earning special time hours equal to her male counterparts only after she filed a charge of discrimination. Furthermore, during that time, Perdue earned a majority of his special time hours operating a industrial roll-off leaf collection vehicle that Plaintiff is not qualified to operate.

Plaintiff asserts that "if a jury were to accept the Plaintiff's method of computing special time it could infer discriminatory animus may have played a part in its apportionment and vice versa with Defendant. Such a disputed fact should be resolved by the jury." This argument is off the mark. There is no dispute that during any relevant period of time for purposes of Plaintiff's discrimination claims, Plaintiff earned more special time hours than Perdue. The period beginning in February 2006 and ending in December 2006 is completely arbitrary and includes four months where Perdue performed a duty Plaintiff was unqualified to perform herself. For these reasons, Perdue is not a proper comparator.

---

[10] Plaintiff has not alleged, and the court will not consider whether this change was caused by Plaintiff's filing of an EEOC charge.

Cleophus Gamble is also not a proper comparator as he is not similarly situated to plaintiff in all relevant respects. *Rioux*, 520 F.3d at 1280.  Defendant offers six reasons why Gamble is not similarly situated to Plaintiff: (1) Gamble and Plaintiff have different supervisors; (2) Gamble has substantial seniority to Plaintiff; (3) Gamble has more familiarity with routes along which special time was offered; (4) Gamble was in closer proximity to the routes; (5) Gamble is qualified to operate more equipment than Plaintiff; and (6) Gamble regularly volunteers for special time work and Plaintiff does not.[11]  Plaintiff contends that all drivers are familiar with each other's routes and does not meaningfully address the issue of proximity.  However, the court finds that the remaining two factors, different supervisors and volunteering, are most important in distinguishing Gamble from Plaintiff.

Gamble works under Route Manager Tony Richardson, who does not supervise Plaintiff's geographical territory.  Plaintiff, in contrast, is supervised by Jake Herndon.  While it is undisputed that a supervisor technically can assign extra work to any driver, even one not ordinarily under his supervision, the record indicates, by Plaintiff's own admission, that special time assignments come from a driver's ordinary Route Manager:

> Q:    Who decides Saturday and special time for you?
> A:    My supervisor.
> Q:    Is that Jake Herndon?
> A.    Yes.

---

[11] The record does not indicate that seniority plays a role in assignment of special time, nor is there evidence that Gamble operated any equipment that Plaintiff is not qualified to operate while performing special time work.  Therefore, the court will not address these issues with respect to the comparator analysis.

(Pl. Depo., Doc. #24-1 at 230).  Thus, Gamble is not similarly situated to Plaintiff with respect to special time assignments because they are under different supervisors who are generally responsible for deciding special time assignments.

More strikingly, the record indicates that Plaintiff and Gamble were not similarly situated because Plaintiff was not available to perform the same amount of special time work as Gamble. The undisputed evidence shows that Gamble finished his regularly assigned routes in sufficient time to cover extra assignments, which he regularly volunteered for.  (Doc. #24-4 at ¶ 42).  Plaintiff, in contrast, indicated that she was only available to perform special time work on Wednesdays and Thursdays after 2:30 or 3:00 and Fridays.  (Doc. #24-1 at 97-98, 101-02, 127).  Gamble is not a proper comparator because Plaintiff was not available to perform the work Gamble performed.

Plaintiff argues that she was denied the opportunity to perform extra work on Saturdays and stopped requesting Saturday work, finding her requests to be futile.  In her deposition, Plaintiff said she specifically requested Saturday work "at least four or five" times (as required to receive Saturday work).  (Doc. #24-1 at 118).  The record indicates that Plaintiff was offered and received at least seven Saturday shifts.  (Doc. #24-4 at ¶ 51; #24-2 at Ex. 3).  The record, therefore, indicates that Plaintiff was not subject to an adverse employment action with respect to this requested work.

Summary judgment is appropriate on Plaintiff's claims of discrimination with respect to special time and Saturday work because Plaintiff cannot establish a *prima facie* case of discrimination.  As explained above, Plaintiff has not identified a proper comparator for purposes of Title VII analysis.[12]  Neither Perdue nor Gamble were similarly situated to Plaintiff in all relevant

---

[12] The court understands that the *McDonnell Douglas/Burdine* model is not to be rigidly or mechanically applied.  Nevertheless, Plaintiff is not able to make out a *prima facie* case under any appropriate formulation.

respects besides gender.  *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1273-74 (11th Cir. 2004) ("[T]he individuals must be similarly situated in all relevant respects besides race . . . since '[d]ifferent treatment of *dissimilarly* situated persons does not violate' civil rights laws." (*citing Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998); and *E&T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)) (emphasis in original)).

### ii.      Plaintiff Cannot Show Discriminatory Animus

Even if a plaintiff is able to prove her *prima facie* case of discrimination, she must also meet her burden under the *McDonnell Douglas* analysis of showing that the defendant's articulated nondiscriminatory reasons were merely pretext for unlawful discrimination.  "[T]o avoid summary judgment [the plaintiff] must introduce *significantly probative evidence* showing that the asserted reason is merely pretext for discrimination."  *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted) (emphasis added).  A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515.

The analysis, at this point, closely tracks the analysis of why Plaintiff is unable to identify a proper comparator.  Defendant meets its burden of articulating legitimate, nondiscriminatory reasons by asserting the same reasons why Gamble is not similarly situated to Plaintiff[13] – namely, that different supervisors made the assignments, Gamble was more senior than Plaintiff, Gamble had more familiarity with the routes, Gamble was in closer proximity to the work to be performed,

---

[13] Because Gamble is the only employee even remotely similarly situated to Plaintiff who was arguably treated more favorably than Plaintiff, Defendant need only proffer reasons why he received more special time hours than Plaintiff to meet its burden.  As explained above, during the only period in which Perdue earned more special pay hours than Plaintiff, he operated a vehicle Plaintiff was not qualified to drive.  This is a legitimate nondiscriminatory reason that Plaintiff has not rebutted.

Gamble was qualified to operate more equipment than Plaintiff, and Gamble regularly volunteered for the work while Plaintiff did not.

As explained above, Plaintiff cannot rebut each of these reasons.  Plaintiff offers no response to Defendant's contention that she was not in close proximity to the special time work to be performed.[14]  Assuming, however, that Gamble was not in closer proximity to the work that needed to be performed, Plaintiff cannot rebut Defendant's contention that she was assigned less work because she was under a different supervisor and was not available as often as Gamble.

Indeed, as previously noted, by Plaintiff's own admission, special time hours are generally assigned by a driver's ordinary supervisor.  Plaintiff was given six hours of special time every Friday by Herndon, her supervisor.  Likewise, under this regime, Gamble's supervisor would ordinarily assign available special time work to those under his direct supervision.  Moreover, the evidence also is clear that Plaintiff was not always available to perform special time work and did not volunteer for such work as often as Gamble.  Plaintiff has not presented *any* evidence – let alone "significantly probative evidence" – to rebut Waste Away's proffered reasons why Gamble received more special time work than Plaintiff.  *Clark*, 990 F.2d at 1228; *see also Nix*, 738 F.2d  at 1187 (Explaining that an employer may take action with respect to an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").  Because Plaintiff cannot assert a *prima facie* case of discrimination, because she cannot rebut all of Defendant's articulated legitimate nondiscriminatory reasons why she received fewer special time hours and Saturday work than fellow drivers, and because Plaintiff presents no evidence

_____

[14] It is certainly more economical for Waste Away to utilize a worker who is already near a special time assignment rather than paying another available worker for the extra time it would take to get from her location to the special time assignment's location.

that any decisions made were based on a discriminatory reason, there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law on Plaintiff's claims as they relate to special time pay and Saturday work.

> **D.      Plaintiff's Overtime Claims.**

Plaintiff also claims that Defendant discriminated against her in violation of Title VII by denying her overtime hours.  The term "overtime hours," as used by Waste Away refers to any hours in excess of forty hours worked in a given workweek.  This includes the time it takes a driver to complete her regularly assigned work as well as any extra work such as special time and Saturday work performed after a driver has worked for forty hours in a given week.  Importantly, "overtime" is not necessarily assigned by Waste Away management; rather, it is automatically given to drivers for any time worked beyond forty hours in a week.  Management is responsible for doling out special time and Saturday work, which, if done in excess of forty hours in a week, are counted as overtime, but if a driver requires more than forty hours in a week to compete her assigned route, overtime is automatically given without requiring any managerial approval.

It is undisputed that all drivers are permitted (in fact, expected) to work whatever overtime is necessary to complete their assigned routes.  (*See* Doc. #24-1 at 216-17).  Plaintiff recognized the distinction between "overtime" generally and the types of extra work assigned by supervisors.  She noted that, with respect to overtime on the forty hour clock: "we all do that; because even though we are on a day rate, it's still based on a forty hour work period.  What I'm concerned about is special pay, the opportunities to do special pay."  (Doc. #24-1 at 216).  As Plaintiff points out, any grievances she has are over extra work opportunities assigned by management (*i.e.*, special time and Saturday work), not overtime generally.  *See* III.C., *supra*.

A Title VII disparate treatment claim attacks *intentional* discrimination. *See Reeves* 530 U.S. 133 (2000); *Hicks*, 509 U.S. at 509-12 (1993); *Nix* 738 F.2d at 1184. Overtime worked at the Plaintiff's discretion without a supervisors approval is not a proper measure for intentional discrimination. Defendant cannot be found to have discriminated with respect to overtime decisions it did not make, especially when overtime (other than special time and Saturday work) is available to all employees on the same as-needed basis. Plaintiff makes no claim that she was denied overtime pay for any hours over forty she worked in a regular work week, nor does she claim that she was restricted from working extra hours to complete her regularly scheduled route. Her claims of discrimination center on hours assigned by management, namely special time and Saturday work – work that often qualifies as overtime. *See* III.C., *supra*. Thus, Plaintiff's claims for denial of "overtime" as a separate and distinct claim from that related to the denial of special time or Saturday work are due to be dismissed.[15]

## IV.    Conclusion

Defendant has carried its burden on summary judgment of demonstrating that there are no material facts in dispute and that it is entitled to judgment as a matter of law on Plaintiff's Title VII claims. Additionally, Plaintiff has abandoned her Equal Pay Act claims. Accordingly, Waste Away's motion for summary judgment is due to be granted and Plaintiff's complaint is due to be dismissed with prejudice. The court will enter an order consistent with this Memorandum Opinion granting Waste Away's Motion for Summary Judgment and dismissing Plaintiff's lawsuit with prejudice.

---

[15] Furthermore, had Plaintiff tried to assert a claim of discrimination based upon denial of overtime opportunities caused by changes in her work duties/assignments (which she does not), such a claim would be due to be dismissed as untimely as explained in III.B., *supra*.

**DONE** and **ORDERED** this _____23rd_____ day of March, 2009.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE